UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on May 5, 2015

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | **CRIMINAL NO. 16-CR-163** |
| v. | : | **Grand Jury Original** |
| | : | |
| HARRY MEIR MIMOUN AMAR | : | |
| ALSO KNOWN AS "HARY AMAR" | : | |
| ALSO KNOWN AS "ARI AMAR," | : | **VIOLATION:** |
| | : | |
| SABINA SELIMOVIC, | : | **18 U.S.C. § 1349  (Conspiracy to Commit** |
| | : | **Wire Fraud)** |
| DANIEL ALEXANDRU CIOMAG, | : | |
| ALSO KNOWN AS "DANI CIOMAG," | : | |
| | : | |
| and | : | **FORFEITURE ALLEGATION:** |
| | : | **18 U.S.C. § 981(a)(1)(C); and** |
| CRISTIAN FLAMANZEANU | : | **28 U.S.C. § 2461(c), 21 U.S.C. § 853(p)** |
| ALSO KNOWN AS "CHRISTIANO | : | **(Criminal Forfeiture)** |
| FLAMANZEANO,"  | : | |
| | : | |
| Defendants. | : | **UNDERSEAL** |
| | : | |

SUPERSEDING INDICTMENT

The Grand Jury charges that:

At all times material to this Superseding Indictment:

Introduction

1.    Defendant HARRY MEIR MIMOUN AMAR, also known as "HARY AMAR"

and "ARI AMAR" ("AMAR"), was a resident of Israel and a citizen of Morocco and Israel.

2.    Defendant SABINA SELIMOVIC ("SELIMOVIC") was a resident of Germany

and a citizen of Serbia.

3.     Defendant DANIEL ALEXANDRU CIOMAG, also known as "DANI CIOMAG" ("CIOMAG"), was a resident and citizen of Romania.

4.     Defendant CRISTIAN FLAMANZEANU, also known as "CHRISTIANO FLAMANZEANO" ("FLAMANZEANU"), was a resident and citizen of Romania.

5.     Co-Conspirator 7 ("CC-7") was a resident and citizen of Hungary.

6.     Co-Conspirator 10 ("CC-10") was a resident and citizen of Romania.

7.     Co-Conspirator 14 ("CC-14") was a resident and citizen of Israel.

## Formation of the Business Email Compromise Scheme

8.     From in and around November 2010 through in and around April 2013, CC-7, CC-10, CC-14, and others, organized and participated in a vehicle fraud scheme targeting victims by way of fraudulent advertisements on the Internet for the purported sale of vehicles. Unbeknownst to the vehicle buyers, the individuals placing the fraudulent advertisements did not, in fact, own the vehicles, but were merely advertising the vehicles to lure buyers into transferring funds to bank accounts opened and controlled by members of the vehicle fraud conspiracy using false identity documents.  Victim funds were then quickly withdrawn from the fraudulently opened bank accounts for the benefit of the co-conspirators, and the victims never received the vehicles.

9.     In or around January 2014, some of the individuals who had participated in the vehicle fraud scheme referenced above, including CC-7, CC-10, and CC-14, entered into a new conspiracy to conduct a more lucrative fraud scheme.  That new scheme, described in further detail below, involved the sending of false and fraudulent emails to employees of companies to lure those employees into transferring company funds to bank accounts controlled by the scheme's conspirators.

2

10.     In or around January 2014 through in or around March 2014, CC-10 and defendant CIOMAG, and others known and unknown to the Grand Jury, traveled to Israel in order to learn how to conduct the new fraud scheme from individuals already conducting the scheme in Israel, including defendant AMAR.

11.     Beginning in or around January 2014 through in or around March 2015, defendants AMAR, SELIMOVIC, CIOMAG, and FLAMANZEANU, together with other co-conspirators known and unknown to the Grand Jury, executed an international, cyber-enabled fraud scheme commonly referred to as a "Business Email Compromise," "BEC," "CEO Impersonation," or "cyber-phishing" scheme (hereinafter referred to as the "BEC scheme").

12.     It was part of the scheme that defendants AMAR, SELIMOVIC, CIOMAG, and FLAMANZEANU, together with others known and unknown to the Grand Jury, deceived mid-level employees of target companies, who maintained access to and control over the target companies' bank accounts, convincing employees to transfer large sums of money to bank accounts opened and controlled by other co-conspirators.

13.     In the execution of the BEC scheme, defendants AMAR, SELIMOVIC, CIOMAG, and FLAMANZEANU, together with other co-conspirators known and unknown to the Grand Jury, targeted mid-sized and large companies through "spoofed" emails, that is, emails that purported to come from someone else, by co-conspirators impersonating executive-level employees of the companies, such as the President and Chief Executive Officer ("CEO") of a company.

14.     Once an employee of a target company had been "hooked" by a co-conspirator, the company employee was led to believe that they were being entrusted to handle a large financial transaction, such as a "secret" corporate acquisition. The employee was then instructed

by co-conspirators to initiate wire transfers from the company's corporate bank accounts to bank accounts controlled by members of the criminal enterprise to pay for the alleged corporate acquisition.

15.     Once the corporate funds were transferred to bank accounts controlled by the co-conspirators, the funds were quickly wire transferred out of the reach of the target corporation into accounts located in the People's Republic of China and elsewhere, with the funds ultimately being delivered to co-conspirators located in Europe and elsewhere.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

16.     The allegations set forth in paragraphs 1 through 15 of this Superseding Indictment are realleged and incorporated as if fully set forth in this paragraph.

### The Object of the Conspiracy

17.     From in or around January 2014 through in or around March 2015, within the District of Columbia and elsewhere, defendants AMAR, SELIMOVIC, CIOMAG, and FLAMANZEANU, together with other co-conspirators known and unknown to the Grand Jury, did knowingly and intentionally conspire, combine, confederate, and agree to commit offenses against the United States, that is to knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme and artifice, to transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, and sounds, in violation of Title 18, United States Code, Section 1343 (wire fraud).

### The Goal of the Conspiracy

18.     The goal of the conspiracy was for the co-conspirators to enrich themselves

through their execution of a wire fraud scheme using the Internet and primarily United States-based electronic communications to falsely pose as corporate executives and make false representations to deceive corporate employees into transferring by wire large sums of money from corporate bank accounts to bank accounts controlled by the co-conspirators.

## Manner and Means

19.     Among the manners and means by which defendants AMAR, SELIMOVIC, CIOMAG, and FLAMANZEANU, together with other co-conspirators known and unknown to the Grand Jury, would and did carry out the objectives of the BEC scheme were the following:

a.     They would and did devise and execute a scheme and artifice to defraud in which they operated a cyber-enabled fraud scheme.

b.     They would and did instruct mid-level employees of target companies, who maintained access to and control over a target company's bank accounts, to transfer large sums of money to bank accounts opened and controlled by other co-conspirators.

c.     They would and did instruct those mid-level employees to wire money by sending them "spoofed" emails that the co-conspirators made to appear as if they were originating from executive-level employees of the target companies. The co-conspirators created these fraudulent emails by purchasing domain names from a domain name registrar located in the United States, and those domain names were hosted on servers located within the United States. The co-conspirators chose to purchase domain names from registrars located in the United States because: (1) those registrars accepted payment in the form of Bitcoin, which is a virtually untraceable electronic fiat currency; and (2) those registrars offered services which anonymized the creator of the domain name thereby preventing others from determining who, in fact, truly created that domain name. The co-conspirators purchased the domain names from the United

States-based domain name provider by initiating the transfer of Bitcoin through the Internet to the domain name registrars located in the United States.

d.      They would and did purchase domain names from the United States-based domain name registrars that closely mimicked the actual domain names of the target companies in order to trick the companies' employees into believing that the emails the co-conspirators sent from the fraudulent domain names were actually being sent from an executive-level employees of the target companies.

e.      They would and did use computer programs, such as Mozilla Thunderbird, to convert those fraudulent domain names into domain names that appeared identical to the target companies' actual domain names.

f.      They would and did instruct the mid-level employees to transfer the large sums of money by using emails that were "spoofed" to make them appear as if they were coming from executive-level employees of the company, such as the Presidents, CEOs, or Chief Financial Officers ("CFOs") of the target companies.

g.      They would and did create these "spoofed" emails by using a fee-based Internet database to learn which employees at the target companies likely had the authority to transfer large sums of money to external bank accounts.  The co-conspirators also used those databases to learn the email addresses for the presidents, CEOs, and CFOs of the target companies.

h.      They would and did send their spoofed emails to the target companies by re-configuring the Simple Mail Transport Protocol ("SMTP") settings to utilize servers located in the United States to ensure that their fraudulent emails reached the employees of the target companies and were not caught in the target companies' spam filters.

    i.      They would and did purchase other domain names from domain name registrars located within the United States to create websites for fictitious outside counsel that were purportedly working on the transaction and that, when viewed by employees of the target companies, would backstop the co-conspirators fraudulent representations.

    j.      They would and did operate the BEC scheme out of a base of operations, also known as "safe houses," which they periodically moved from country to country. The co-conspirators maintained the "safe houses" in different countries from those in which the target companies were located and from those in which the bank accounts receiving monetary transfers of criminal proceeds were opened.

    k.      They would and did recruit individuals with the requisite language and technical capabilities to work in the "safe houses" from which the BEC scheme was operated to execute the scheme.

    l.      They would and did use Virtual Private Networks ("VPNs"), technology which allowed them to hack into and route Internet traffic through Wi-Fi networks in the vicinity of the "safe houses," voice-changing software, and other technical exploitations, in order to avoid detection by law enforcement and the target corporations.

    m.      They would and did communicate through electronic means, such as by text messages and online chat communications, through United States-based messaging applications, such as WhatsApp and Wickr.

    n.      They would and did open bank accounts in the names of companies to receive the proceeds of the BEC scheme from the target companies' bank accounts, and subsequently transferred or attempted to transfer those funds out of the bank accounts controlled by the co-conspirators to bank accounts located in the People's Republic of China and elsewhere.

o.   They would and did pick up proceeds of the BEC scheme in cash in Hungary and elsewhere.

p.   They would and did travel to and within the United States and internationally in furtherance of conducting the BEC scheme.

## Overt Acts

20.   In furtherance of the scheme and artifice to defraud and to affect the objects thereof, defendants AMAR, SELIMOVIC, CIOMAG, and FLAMANZEANU, together with other co-conspirators known and unknown to the Grand Jury, committed the following overt acts, among others, in the District of Columbia and elsewhere:

a.   From in or around January 2014 through in or around March 2014, CC-7 told CC-10 about how he had been working with CC-14 providing bank accounts and moving funds that were the proceeds of a fraud scheme that deceived corporate employees into engaging in unauthorized wires from corporate bank accounts.

b.   From in or around February 2014 through in or around March 2014, CC-14 invited CC-10 and defendant CIOMAG to travel to Israel and to meet with individuals conducting the BEC scheme.

c.   From in or around February 2014 through in or around March 2014, defendant CIOMAG and CC-10 traveled to Israel to learn how to conduct the BEC scheme.

d.   From in or around February 2014 through in or around March 2014, while in Israel, defendant CIOMAG and CC-10 met with CC-14 and defendant AMAR to discuss the BEC scheme.

e.   From in or around February 2014 through in or around March 2014, defendants CIOMAG and AMAR, CC-10, and CC-14 agreed that defendant AMAR would teach

defendant CIOMAG and CC-10 how to conduct the BEC scheme for a percentage of any money obtained as a result of the scheme.

      f.    On or about April 30, 2014, CC-7 met with an individual ("W-11") in Europe, in order to recruit W-11 to participate in the BEC scheme.  CC-7 explained to W-11 that its role in the BEC scheme would involve emailing company employees and talking to them on the telephone in order to induce the target company employees to transfer large sums of money to bank accounts controlled by CC-7 and other members of the criminal enterprise.  CC-7 told W-11 that the "safe house" was being run by CC-10 and that CC-14 was also involved in the scheme.

      g.    From in or around May 2014 through in or around June 2014, CC-10, defendants CIOMAG and FLAMANZEANU, and another individual known to the Grand Jury, traveled to Turkey to set up a "safe house" and to begin conducting the BEC scheme.

      h.    On or about May 1, 2014, CC-7 traveled to the District of Columbia to meet with an individual ("W-12") in order to: (1) recruit W-12, who is a native speaker of English, to participate in the BEC scheme; and (2) request that W-12 travel to Turkey to work in the "safe house," which was being operated by CC-10 and other co-conspirators.

      i.    On or about June 18, 2014, defendants CIOMAG and FLAMANZEANU, and CC-10, together with co-conspirators known and unknown to the Grand Jury, through false representations caused a Spanish company, herein designated as Victim 9, to wire transfer €283,400 to a bank account in Hungary provided by CC-7.

      j.    Between on or about June 18, 2014, and in or around September 2014, CC-10, defendants CIOMAG and FLAMANZEANU, and another individual known to the Grand Jury, traveled to Bulgaria to set up another "safe house" to conduct the BEC scheme.

k.    In or around July 2014, defendants AMAR and SELIMOVIC traveled to Bulgaria to work with defendants CIOMAG and FLAMANZEANU, and CC-10, together with other co-conspirators known and unknown to the Grand Jury, to execute the BEC scheme.  The co-conspirators decided to target German companies, among others, because of defendant SELIMOVIC's fluency in the German language.

l.    In or around July 2014 through in or around August 2014, while the "safe house" was operating in Bulgaria, defendants AMAR, SELIMOVIC, CIOMAG, and FLAMANZEANU, and CC-10, together with other co-conspirators known and unknown to the Grand Jury, for the purpose of executing the BEC scheme, through the use of false representations, caused or attempted to cause the following companies to transmit funds by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit:  interstate and international wire transactions, to a bank account controlled by the co-conspirators, as set forth below:

| ¶ | DATE | COMPANY | AMOUNT WIRED | AMOUNT LOST |
|---|------|---------|--------------|-------------|
| 1.(1) | In or around July 2014 through in or around August 2014 | Unknown German Company (Herein designated as Victim 6) | €550,000 | €550,000 |
| 1.(2) | On or about August 1, 2014 | Finnish Company (Herein designated as Victim 10) | €383,400 | €0 |
| 1.(3) | In or around August 2014 through in or around September 2014 | Portuguese Company (Herein designated as Victim 5) | €380,000 | €380,000 |

m.    In or about August 2014, CC-7 met with W-11 in Europe and attempted

again to recruit W-11 for participation in the BEC scheme.  CC-7 requested that W-11 travel to Bulgaria to work in the "safe house," due to W-11's facility with the English language.

n.      On or about August 1, 2014, CC-7 instructed W-12 to travel from Maryland to New York, New York, to discuss W-12's potential travel to Europe to work in the "safe house."

o.      On or about August 1, 2014, W-12 traveled from Maryland, through the District of Columbia, to New York, New York to meet with CC-7 and CC-14 to discuss participating in the BEC scheme.

p.      On or about October 3, 2014, CC-7 traveled to the District of Columbia and met with W-12 to recruit W-12 to travel to a location in Europe to work in the "safe house" and to participate in the BEC scheme.

q.      In or around October 2014, defendant CIOMAG and CC-10 traveled from Romania to Hungary, and met with CC-7, and others known and unknown to the Grand Jury, to discuss the operations of the BEC scheme and to discuss funding another "safe house."

r.      In or around October 2014, CC-7 traveled to Bucharest, Romania and deposited €15,000 in a hotel safe, which was picked up by CC-10 in order to establish a new "safe house" in Prague, Czech Republic.

s.      Between in or around October 2014 and in or around November 2014, defendants SELIMOVIC, CIOMAG, and FLAMANZEANU, and CC-10, together with other co-conspirators known and unknown to the Grand Jury, traveled to the Czech Republic and established a "safe house" to continue conducting the BEC scheme.

t.      Between in or around November 2014 and in or around December 2014, while the "safe house" was operating in the Czech Republic, defendants SELIMOVIC,

11

CIOMAG, and FLAMANZEANU, and CC-10, together with other co-conspirators known and unknown to the Grand Jury, for the purpose of executing the BEC scheme through the use of false representations, caused or attempted to cause the following companies to transmit funds by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit:  international wire transactions, to a bank account controlled by the co-conspirators, as set forth below:

| ¶ | DATE | COMPANY | AMOUNT WIRED | AMOUNT LOST |
|---|------|---------|--------------|-------------|
| t.(1) | On or about November 10, 2014 | German Company (Herein referred to as Victim 1) | €570,000 | €570,000 |
| t.(2) | On or about November 12, 2014 | German Company (Herein referred to as Victim 1) | €570,000 | €570,000 |
| t.(3) | On or about November 13, 2014 | Germany Company (Herein referred to as Victim 1) | €855,000 | €855,000 |
| t.(4) | On or about November 17, 2014 | German Company (Herein referred to as Victim 1) | €855,000 | €855,000 |
| t.(5) | On or about November 18, 2014 | German Company (Herein referred to as Victim 1) | €1,564,080 | €0 |
| t.(6) | On or about November 26, 2014 | German Company (Herein referred to as Victim 4) | €570,000 | €570,000 |
| t.(7) | On or about November 28, 2014 | German Company (Herein referred to as Victim 4) | €850,000 | €850,000 |
| t.(8) | On or about December 2, 2014 | German Company (Herein referred to as Victim 4) | €850,000 | €850,000 |
| t.(9) | On or about December 3, 2014 | German Company (Herein referred to as Victim 4) | €1,700,000 | €1,700,000 |
| t.(10) | On or about December 9, 2014 | German Company (Herein referred | €1,100,000 | €1,100,000 |

| | | as Victim 4) | | |
|---|---|---|---|---|

u.  From in or around January 2015 through in or around February 2015, defendants SELIMOVIC and CIOMAG, and CC-10, together with other co-conspirators known and unknown to the Grand Jury traveled to Poland and established a "safe house" to continue conducting the BEC scheme. The co-conspirators were unsuccessful in their implementation of the BEC scheme from the Polish "safe house."

v.  Between on or about January 26, 2015, and January 31, 2015, while located in the United States, CC-7 communicated with CC-10 through electronic means, including telephone calls and an Internet chat program called Pidgin, regarding the BEC scheme. CC-10 asked CC-7 to travel to Poland for a meeting and informed CC-7 that "everything was ready" to conduct the BEC scheme.

w.  On or about January 31, 2015, CC-7 traveled from the United States to Poland to meet with CC-10 to discuss the BEC scheme.

x.  Between on or about February 2, 2015, and on or about February 3, 2015, defendant CIOMAG, CC-7 and CC-10 met in Warsaw, Poland, to discuss conducting the BEC scheme. CC-10 requested that CC-7 provide bank accounts to receive BEC scheme proceeds.

y.  On or about February 9, 2015, while in the United States, CC-7 communicated with CC-10 via the Pidgin chat program. CC-7 provided CC-10 with bank account information in order for the bank account to receive proceeds of the BEC scheme.

z.  Between on or about February 10, 2015, and February 11, 2015, while in the United States, CC-7 communicated with CC-10 via the Pidgin chat program. CC-10 informed CC-7 that the co-conspirators attempted to target a German company, but that there was something wrong with the bank account information CC-7 provided, and the funds did not

go through.

aa.     From in or around February 2015 through in or around March 2015, defendants SELIMOVIC and CIOMAG, and CC-10, together with other co-conspirators known and unknown to the Grand Jury traveled to Slovakia and established a "safe house" to continue conducting the BEC scheme.

bb.     On or about February 26, 2015, while in the United States, CC-7 communicated with CC-10 via the Pidgin chat program and discussed in detail how the co-conspirators infiltrated the target corporations.

cc.     In or around March 2015, while the "safe house" was operating in the Slovakia, defendants SELIMOVIC, CIOMAG, and FLAMANZEANU, and CC-10, together with other co-conspirators known and unknown to the Grand Jury, for the purpose of executing the BEC scheme through the use of false representations, caused or attempted to cause the following companies to transmit funds by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit:  international wire transactions, to a bank account controlled by the co-conspirators, as set forth below:

| ¶ | DATE | COMPANY | AMOUNT WIRED | AMOUNT LOST |
|---|------|---------|--------------|-------------|
| cc.(1) | On or about March 5, 2015 | German Company (Herein referred to as Victim 2) | €570,000 | €0 |
| cc.(2) | On or about March 10, 2015 | German Company (Herein referred to as Victim 3) | €750,000 | €0 |

## CRIMINAL FORFEITURE ALLEGATION

1.      Upon conviction of the offenses alleged in Count One of the Superseding Indictment, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

2.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))**

A TRUE BILL:

FOREPERSON.

ATTORNEY OF THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA

16