UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HARRY MEIR MIMOUN AMAR<br>ALSO KNOWN AS "HARY AMAR"<br>ALSO KNOWN AS "ARI AMAR"<br><br>Defendant | CRIMINAL NO. 16-cr-00163 (CKK)<br><br>**FILED**<br>APR 27 2018<br>Clerk, U.S. District & Bankruptcy<br>Courts for the District of Columbia |

### REDACTED STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, HARRY MEIR MIMOUN AMAR, with the concurrence of his attorneys, agree and stipulate as follows:

### Introduction

1. Defendant HARRY MEIR MIMOUN AMAR, also known as "Hary Amar" and "Ari Amar" ("the defendant," "defendant AMAR," and "AMAR") was a resident and citizen of Israel and Morocco.

2. Co-Conspirator 10 ("CC-10"), Co-Conspirator Daniel Alexandru Ciomag ("Ciomag"), Co-Conspirator Cristian Flamanzeanu ("Flamanzeanu"), and Co-Conspirator 22 ("CC-22"), were residents and citizens of Romania.

3. Co-Conspirator Sabina Selimovic ("Selimovic") was a resident of Germany and a citizen of Serbia.

4. Co-Conspirator 14 ("CC-14") was a resident and citizen of Israel.

5. Co-Conspirator 7 ("CC-7") was a resident and citizen of Hungary.

(N)

**The Conspiracy to Commit the Business Email Compromise Scheme**

6. From in or around January 2014, through in or around August 2014, within the District of Columbia and elsewhere, defendant AMAR, together with other co-conspirators, did knowingly and intentionally conspire, combine, confederate, and agree to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme and artifice, to transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, and sounds, in violation of Title 18, United States Code, Section 1343 (wire fraud).

A. **Background on the Business Email Compromise Scheme**

7. In or around January 2014, CC-7, CC-10, CC-14, and Defendant Ciomag met in Budapest, Hungary to discuss a relatively new lucrative cyber fraud scheme being conducted by individuals located in Israel. That new scheme, described in further detail below, involved the sending of false and fraudulent emails to employees of companies to lure those employees into transferring company funds to bank accounts controlled by the scheme's conspirators.

8. In or around February 2014 through in or around March 2014, CC-10, and defendant Ciomag, traveled to Israel to meet with CC-14 and others in order to learn how to conduct the new fraud scheme.

9. Beginning in or around April 2014, and continuing through in or around August 2014, defendant AMAR, together with other co-conspirators, executed an international, cyber-enabled fraud scheme commonly referred to as a "Business Email Compromise" or "BEC" scheme (hereinafter referred to as the "BEC scheme").

10. It was part of that scheme that defendant AMAR, together with his co-conspirators, deceived mid-level employees of target companies, who maintained access to and control over the target companies' bank accounts, convincing those employees to transfer large sums of money to bank accounts opened and controlled by other co-conspirators.

11. In executing the BEC scheme, defendant AMAR, together with his co-conspirators, targeted mid-sized and large companies through "spoofed" emails, that is, emails that purported to come from someone else, by co-conspirators impersonating executive-level employees of the companies, such as the President and Chief Executive Officer ("CEO") of a company.

12. Once an employee of a target company had been "hooked" by a co-conspirator, the company employee was led to believe that they were being entrusted to handle a large financial transaction, such as a "secret" corporate acquisition. The employee was then instructed by the co-conspirators to initiate wire transfers from the company's corporate bank accounts to bank accounts controlled by members of the criminal enterprise to pay for the alleged corporate acquisition.

13. To fraudulently induce the employee to initiate the wire transfer of money, the co-conspirators created fake non-disclosure agreements appearing to come from the European Securities and Markets Authority (or "ESMA"). The ESMA non-disclosure agreements were sent by the co-conspirators, through email, to the mid-level employees at the victim companies. The co-conspirators then instructed the mid-level employees to execute the agreements because the purported corporate transaction was highly confidential and could not be shared with anyone. The non-disclosure agreements, however, needed to be signed by the actual high-ranking corporate officials at the victim company who were being impersonated by the co-conspirators. Thus, the

co-conspirators would find the high-ranking officials' signatures on publicly filed documents and through internet databases and would copy those signatures onto the phony contracts.

14. The co-conspirators would also contact the mid-level employees at the victim companies by telephone, posing as outside counsel assisting the high-ranking corporate officials in the phony corporate transaction. To add to the supposed legitimacy of the transaction, the co-conspirators would also create fake websites for the attorneys.

15. Once the co-conspirators successfully persuaded the employees at the victim companies to transfer money to the co-conspirators' bank accounts, the funds were quickly wire transferred out of reach of the victim companies by members of the conspiracy and into bank accounts located in the People's Republic of China and elsewhere, with the funds ultimately being delivered to co-conspirators located in Europe and elsewhere.

B. **The Technical Aspects of the BEC Scheme**

16. The co-conspirators created the "spoofed" emails by using a fee-based Internet database to learn which employees at the target companies likely had the authority to transfer large sums of money to external bank accounts. The co-conspirators also used those databases to learn the email addresses for the presidents, CEOs, and CFOs of the target companies.

17. The co-conspirators then purchased domain names from a United States-based domain name registrar. They would purchase domain names that closely mimicked the actual domain names of the victim companies in order to trick the companies' employees into believing that the emails the co-conspirators sent from the fraudulent domain names were actually being sent from executive-level employees of the target companies.

18. The co-conspirators chose to purchase the domain names from this United States-based registrar because: (1) the registrar accepted payment in the form of Bitcoin, which is a

4

virtually untraceable electronic fiat currency; and (2) the registrar offered services which anonymized the creator of the domain name thereby preventing others from determining who, in fact, truly created that domain name. To purchase the domain names from this registrar, the co-conspirators initiated the transfer of Bitcoin through the Internet to the domain name registrar's servers located in the United States.

19. Once the co-conspirators purchased the domain names, they then used Mozilla Thunderbird, which is an email program, to make the domain names appear identical to the victim companies' actual domain names. The co-conspirators then sent their spoofed emails to the target companies by re-configuring the Simple Mail Transfer Protocol ("SMTP") settings in Mozilla Thunderbird to utilize the servers of well-known email providers in the United States to ensure that their fraudulent emails actually reached the employees of the target companies and were not stopped by the victim companies' spam filters.

20. The co-conspirators also purchased domain names, from the same United States-based domain name registrar, to create the websites for the fictitious outside counsel that were purportedly working on the transaction and that, when viewed by the employees of the target companies, would backstop the co-conspirators' fraudulent representations.

21. The co-conspirators also communicated through electronic means, such as by text messages and online chat communications, through United States-based messaging applications, such as WhatsApp and Wickr.

C.   **The Use of "Safe Houses"**

22. The co-conspirators, including defendant AMAR, executed the BEC scheme out of a base of operations, also known as a "safe house," which they periodically moved from country to country. The co-conspirators maintained the "safe houses" in different countries from those in

which the target companies were located and from those in which the bank accounts receiving monetary transfers of criminal proceeds were opened.

23.     The co-conspirators used Virtual Private Networks ("VPNs"), which is technology that allowed them to hack into and route Internet traffic through Wi-Fi networks in the vicinity of the "safe houses," voice-changing software, and other technical exploitations, in order to avoid detection by law enforcement and the target corporations.

D.     **Defendant AMAR's Role in the BEC Scheme**

24.     In or around February or March 2014, Ciomag and CC-10 traveled to Israel in order to learn how to conduct the BEC scheme. During that time, AMAR, CC-10, CC-14, Witness 1, and others met to discuss the scheme. At that meeting, Witness 1 told CC-10 and CC-14 about the BEC scheme. During the meeting, AMAR acted as a translator between Witness 1, who spoke French, and CC-14 and CC-10, who spoke English. CC-10 indicated that he did not believe that the BEC scheme could be executed successfully. The defendant AMAR indicated that he knew individuals who had conducted the BEC scheme successfully and told CC-10 to search for a news article on the Internet that related to the BEC scheme.

25.     Shortly thereafter, CC-14 requested that AMAR meet with CC-14, CC-10, and Ciomag to discuss the BEC scheme. To persuade AMAR to attend this meeting and for AMAR to help CC-10 and Ciomag, CC-14 offered to provide AMAR with 5% of the proceeds that they gained from implementation of the BEC scheme. AMAR agreed. At the meeting, CC-14, CC-10, Ciomag, and AMAR discussed the BEC Scheme. AMAR told CC-10 and Ciomag that he would be willing to introduce them to certain individuals who had experience executing the BEC Scheme. AMAR also agreed to provide CC-10 and Ciomag any new details he learned concerning how to conduct the BEC Scheme. After CC-10 and Ciomag learned generally how to operate the scheme,

6

AMAR suggested that CC-10 and Ciomag conduct the BEC scheme from Israel. CC-10 and Ciomag, however, insisted on conducting the scheme from Europe.

26.  In or around May 2014, co-conspirators Ciomag, CC-10, CC-22, and Flamanzeanu traveled to Antalya, Turkey, to begin implementation of the BEC scheme.

27.  Over the next few weeks, Ciomag and CC-10 worked on computers gathering information available on the internet to attack target victim companies. Ciomag set up a server, installed software, including encryption programs on computers in order to perpetrate the BEC scheme. Ciomag also set up domain names and used the application "mail.com" to create fake emails. CC-10 researched target companies and their leadership in order to create fraudulent emails and corporate documents. CC-22's role was to translate fraudulent emails and documents into Spanish. CC-10 provided Flamanzeanu with USB flash drives containing signatures of corporate leaders of the target victim companies that needed to be "cleaned-up" or remade. Flamanzeanu used his design skills to make those signatures appear less pixelated, and thereby more authentic, and returned those "cleaned-up" signatures to Ciomag. Ciomag and his co-conspirators then used those signatures to compose and send fraudulent emails to target victim companies.

28.  On or about June 18, 2014, Ciomag, CC-10, CC-22, and Flamanzeanu, fraudulently caused a Spanish company, herein designated as Victim 9, to wire transfer €283,400 to a bank account in Hungary provided by CC-7.[1] Following this successful fraud attack, the co-conspirators left Turkey due to visa restrictions. Ciomag and CC-10 traveled to Hungary and received their group's portion of the scheme. CC-14 eventually provided defendant AMAR with €14,000 from

---

[1] The funds stolen from Victim 9 convert from €283,400 to $383,213, using the exchange rate on the date of the wire transfer.

the BEC attack on Victim 9.[2]  The co-conspirators then decided to set up a new safe house in Varna, Bulgaria.

29.  The initial members of this group of conspirators in Bulgaria were Ciomag, CC-10, CC-22, and Flamanzeanu.  In Bulgaria, Ciomag again set up the computer programs and other co-conspirators continued to develop target victim companies and fraudulent documents to conduct the scheme.  Ciomag also worked with corporate logos that were inserted into the fraudulent emails that were sent to the employees at the victim companies.  The co-conspirators were initially unsuccessful in targeting victim companies in Bulgaria.  As a result, CC-14 requested that AMAR travel to the Bulgarian safe house to look into why the group was not successful.

30.  In or around July 2014, defendant AMAR arrived in Bulgaria and joined the group of conspirators, including Selimovic, Ciomag, CC-10, CC-22, and Flamanzeanu operating the BEC scheme.  AMAR advised the group to use a website for a fake lawyer in order to make the transactions seem more legitimate.  AMAR helped prepare a template of the initial email from the fake chief executive officer of the target company and helped Flamanzeanu draft emails to company employees.  AMAR advised the group how to research information concerning target companies, including how to identify key employees. AMAR, Selimovic, Flamanzeanu, and CC-22 made telephone calls to companies the group was targeting.  Selimovic talked to victim companies on the telephone, posing as an individual involved in a purported business deal.  Ciomag bought domains from a U.S. based company because it accepted bitcoins and "perfect money."  In or around July 2014, AMAR left the Bulgarian safe house.

31.  In or around July 2014, through in or around August 2014, while the "safe house" was operating in Bulgaria, defendant AMAR, Ciomag, CC-10, CC-22, Selimovic, and

---

[2] This equates to $18,930.78 when converted from Euros to U.S. Dollars.

Flamanzeanu, through false representations, caused a German company, herein designated as Victim 6, to wire transfer approximately €539,980 to a bank account controlled by the co-conspirators.[3] The conspirators agreed to allow AMAR to keep 5% from the first successful BEC attack from Bulgaria.

     32.    On or around August 26, 2014, AMAR traveled to Budapest, Hungary to receive some of the proceeds from the attack on Victim 6. CC-7's assistant provided AMAR with an airplane ticket from Israel to Hungary. In Hungary, AMAR met with CC-7's assistant, who provided him with the proceeds. AMAR gave the proceeds to Selimovic and Selimovic's boyfriend. Selimovic and Selimovic's boyfriend then gave AMAR 5% of the proceeds from the BEC attack on Victim 6.[4]

     33.    On or about August 7, 2014, defendant AMAR and his co-conspirators caused a Finnish company, herein designated as Victim 10, to attempt to wire transfer €383,400[5] from the company's bank account to a bank account in Hungary provided by CC-7. The transaction, however, was able to be reversed and the funds returned to the victim.

     34.    In or around July and September 2014, defendant AMAR, Ciomag, CC-10, CC-22, Selimovic, and Flamanzeanu caused a company based in Portugal, herein designated as Victim 5, to wire transfer approximately €380,000 to a bank account in Hungary.[6] Victim 5 was able to alert

---

[3] The approximate amount in U.S. dollars was $710,073, based on the lowest Federal Reserve noon buying rate (the "exchange rate") for the period from July 2014, through August 2014. *See* https://www.federalreserve.gov/releases/h10/default.htm

[4] 5% of the proceeds from the attack on Victim 6 was approximately €26,999 (or $35,503 based on the exchange rate at that time).

[5] The amount in U.S. dollars was $512,260, based on the exchange rate for that date.

[6] The amount in U.S. dollars was $479,560, based upon the lowest conversion rate from August 2014 to September 2014.

the Hungarian bank of the fraudulent wire transfer, and the Hungarian bank returned the money to Victim 5.

35. On or about August 28, 2014, AMAR returned to Bulgaria. On or about September 4, 2014, defendant AMAR left Bulgaria and returned to Israel. Defendant AMAR was then cut out of the BEC scheme being conducted by the other co-conspirators herein. Defendant AMAR did not receive any further proceeds from the group and did not participate in any of their further activities. In total, while the BEC scheme was being conducted in Turkey and Bulgaria: (a) the attempted loss from the four companies was equal to approximately $2,098,283; (b) the actual loss from the four companies was approximately $1,093,557; and (c) defendant AMAR personally received approximately $49,503.

36. Any proceeds that defendant AMAR personally obtained as a result of participating the BEC scheme herein, have been dissipated by him and cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; and/or have been placed beyond the jurisdiction of the Court.

**Limited Nature of Proffer**

This proffer of evidence is not intended to constitute a complete statement of all facts known by the defendant or the government, but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. As to the other named defendants and the charge in the Information, the defendant admits that the allegations in the Information are true or that he does not have information to dispute or disprove those allegations set forth in the Information in any way.

Respectfully submitted,

                            JESSIE K. LIU
                            United States Attorney

By:    _____
        DIANE G. LUCAS, D.C. Bar No. 443610
        DAVID B. KENT, D.C. Bar No. 482850
        MICHAEL J. MARANDO, N.Y. Bar No. 482850
        Assistant United States Attorneys
        (202) 252-7724 (Lucas)
        (202) 252-7762 (Kent)
        (202) 272-7068 (Marando)
        Diane.Lucas@usdoj.gov
        David.Kent@usdoj.gov
        Michael.Marando@usdoj.gov

## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I have read every word of this Statement of the Offense, or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct to the best of my knowledge and belief.

Dated: 4/27/18

HARRY MEIR MIMOUN AMAR
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate to the best of his knowledge and belief.

Dated: 4/27/18

Alan Vinegrad
Attorney for Defendant