**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **HARRY MEIR MIMOUN AMAR, a/k/a "HARY AMAR" AND "ARI AMAR"** | **Case No. 1:16-cr-00163 (CKK)** |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its Memorandum in Aid of Sentencing in the above-captioned matter. The government recommends that the Court sentence Defendant Harry Meir Mimoun Amar to a term of imprisonment of 63 months.

## BACKGROUND

On April 27, 2018, Defendant Amar pled guilty to participating in an international cyber-fraud scheme that ultimately defrauded companies of over $10,000,000. Defendant Amar played a critical role in that scheme – he helped recruit its key participants and trained his co-conspirators about how to execute the scheme successfully. Accordingly, the Presentence Report ("PSR") writer concluded correctly that Defendant Amar was a manager or supervisor in that scheme under United States Sentencing Guideline ("U.S.S.G.") Section 3B1.1, necessitating an upward role adjustment.

Furthermore, Defendant Amar accepted responsibility only after unsuccessfully fighting his extradition to the United States, and only after losing a protracted motions battle over his conditions of release. Defendant Amar also possesses substantial means. His wealth, upbringing, and strong familial ties lead the government to conclude that only one factor motivated

his criminal conduct here – greed.

## **PROCEDURAL HISTORY**

On October 6, 2016, a grand jury in the District of Columbia returned a Superseding Indictment charging Defendants Amar, Ciomag, Sabina Selimovic, and Cristian Flamanzeanu, with one count of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349, for their role in committing an international cyber-fraud scheme known as a "Business Email Compromise" or "BEC" scheme.   ECF No. 4.   This scheme resulted in millions of dollars in losses to victim companies.   *See id*.

On March 1, 2017, law enforcement in Israel arrested Defendant Amar on the charge in the Superseding Indictment.   After Defendant Amar's arrest, he obtained counsel and challenged his extradition to the United States.   The Israeli Supreme Court eventually issued a decision rejecting his challenges to extradition.   Defendant Amar then consented to his extradition to the United States.

On November 16, 2017, Defendant Amar arrived in the United States.   On November 20, 2017, the Court arraigned Defendant Amar on the Superseding Indictment and he consented to pre-trial detention.   Despite being a dual Israeli-Moroccan citizen with no immigration status in the United States, on December 13, 2017, Defendant Amar filed a motion seeking his pre-trial release.   *See* ECF No. 44.   Defendant Amar argued that he was entitled to pre-trial release because his relatives in the United States could post a bond secured by property worth upwards of $2,000,000.   *See* ECF No. 44-1, at p. 1.

A lengthy motions battle ensued.   *See* ECF Nos. 45, 46, 47, 49, 50.   On January 10, 2018, the Court heard oral argument on Defendant Amar's motion.   Following that hearing, the parties

submitted additional briefing in response to questions raised by the Court. *See* ECF No. 51, 52. On January 16, 2018, the Court issued an Order denying Defendant Amar's motion for pre-trial release. ECF No. 53.

Following the Court's denial of Defendant Amar's motion, he asked the government for a plea offer. The parties reached a plea agreement, which the Court entered on April 27, 2018. ECF No. 57. The Court ordered sentencing for August 16, 2018.

The PSR writer calculated Defendant Amar's U.S.S.G. range as being 57 to 71 months. PSR at ¶ 117. In calculating that range, the PSR writer applied a 3-level role adjustment under U.S.S.G. § 3B1.1(b), concluding that Defendant Amar was a manager or supervisor in the scheme because he served as a recruiter and trainer. PSR at ¶¶ 79, 123, pp. 29-30. The PSR writer also noted, "[f]ollowing Mr. Amar's assistance in Bulgaria, the scheme became successful and the group was able to defraud companies into wire-transferring substantial sums of money to bank accounts controlled by members of the conspiracy." PSR at pp. 29-30.

## BUSINESS EMAIL COMPROMISE SCHEMES

Defendant Amar stood at the center of an epidemic facing the business world – business email compromise (or "BEC") schemes. The FBI estimates that, since January 2015, BEC schemes have resulted in total losses of over $3 billion to victim companies worldwide.[1] The FBI predicts this loss amount will continue to grow, as BEC scammers believe they can act with impunity. This is due, in large part, to the significant underreporting of BEC frauds by victims,

---

[1] FBI, *Business E-Mail Compromise, Cyber-Enabled Financial Fraud on the Rise Globally*, *available at*, https://www.fbi.gov/news/stories/business-e-mail-compromise-on-the-rise (last checked July 18, 2018).

who are often reluctant to report their victimization.[2]

In a traditional BEC scheme, the perpetrator creates a fake, or "spoofed," email address nearly identical to the email address of the president, chief executive officer, or other leader of a corporation.   The perpetrator then sends emails to a middle-level manager of that company who has control over that company's bank accounts.   Through social engineering, the perpetrators cause the middle-level employee to believe their assistance is necessary to complete a purported confidential corporate transaction.   The perpetrators then instruct the employee to wire-transfer money to a bank account controlled by the conspiracy.

BEC schemes affect not only a company's bottom line, but also the employees defrauded into wire transferring the money.   Companies often blame their losses on the duped employee for not noticing the fraud.   Some companies even terminate the employees who fall victim to these schemes.[3]

BEC schemes are not easy to complete.   A BEC scammer must possess the social engineering skills necessary to persuade a corporate employee into believing he or she is actually handling a confidential business transaction.   The scammers must also possess familiarity with business jargon to write convincing emails.   Defendant Amar possessed all of these skills, and he used them to participate personally in the BEC scheme in Bulgaria and to teach his co-conspirators how to conduct the BEC scheme successfully.

_____

[2] Eleanora di Liscia, *Beyond Computer Fraud: The Social Engineering Fraud Policy,* New Appleman on Insurance: Current Critical Issues in Insurance Law (Fall 2017) at ¶ 2.

[3] *See Understanding Email Fraud: A Global Survey of IT Leaders in the US, the UK, Australia, France, and Germany*, *available at https://www.proofpoint.com/sites/default/files/pfpt-us-tr-survey-of-understanding-email-fraud-180315.pdf* (last checked July 16, 2018) ("[I]n nearly 1 in 4 attacks, someone was fired for letting it happen.   U.S. companies were the most likely to sack the person deemed responsible, at 40% of all cases.").

## THE INSTANT CASE

As explained in the Superseding Indictment, in January 2014, CC-7, CC-10, CC-14 and Defendant Ciomag met in Budapest, Hungary, to discuss a BEC scheme that individuals in Israel were conducting.   Statement of Offense at ¶ 7.   At that time, CC-7, CC-10, CC-14, and Defendant Ciomag had finished participating in an online vehicle fraud scheme that victimized people around the world into wire-transferring money for cars they believed they were purchasing.

In or around February 2014, through in or around March 2014, CC-10 and Defendant Ciomag traveled to Israel to meet with CC-14 and others to learn how to conduct the BEC scheme. *Id*. at ¶ 8.   During that time, Defendant Amar, CC-10, CC-14, Witness 1, and others met to discuss the scheme.   *Id*. at ¶ 24.   At that meeting, Witness 1 told CC-10 and CC-14 about the BEC scheme.   *Id*.   Defendant Amar acted as a translator between Witness 1, who spoke French, and CC-14 and CC-10, who spoke English.   *Id*.   CC-10 indicated that he did not believe the BEC scheme would be successful.   *Id*.   Defendant Amar indicated he knew individuals who conducted the BEC scheme successfully and told CC-10 to search for a news article online related to that BEC scheme.   *Id*.

Shortly thereafter, CC-14 requested that Defendant Amar meet with CC-14, CC-10, and Defendant Ciomag to discuss the BEC scheme.   *Id*. at 25.   To persuade Defendant Amar to attend this meeting and for Defendant Amar to help CC-10 and Defendant Ciomag, CC-14 offered to provide Amar with 5% of the proceeds gained from the implementation of the BEC scheme.   *Id*. Defendant Amar agreed.   *Id*.

At the meeting, CC-14, CC-10, Defendant Ciomag, and Defendant Amar discussed the BEC scheme.   *Id*.   Defendant Amar told CC-10 and Defendant Ciomag that he would be willing

to introduce them to certain individuals who had experience executing BEC schemes. *Id*. Defendant Amar also agreed to provide CC-10 and Defendant Ciomag with any new details he learned concerning how to conduct the BEC schemes effectively. *Id*. After CC-10 and Defendant Ciomag learned generally how to conduct the scheme, Defendant Amar suggested that CC-10 and Defendant Ciomag operate the BEC scheme from Israel, where Defendant Amar resided. *See id*. CC-10 and Defendant Ciomag insisted on conducting the scheme from Europe instead. *Id*.

In or around May 2014, Defendant Ciomag, CC-10, CC-22, and Defendant Cristian Flamanzeanu traveled to Antalya, Turkey, to begin implementing the BEC scheme. *Id*. at ¶ 26. On or about June 18, 2014, Defendant Ciomag, CC-10, CC-22, and Defendant Flamanzeanu, fraudulently caused a Spanish company (Victim 9) to wire transfer €283,400 (or $383,213) to a bank account in Hungary controlled by the conspiracy. *See id*. at ¶ 28. Following this successful BEC attack, the co-conspirators left Turkey due to visa restrictions. *Id*. CC-14 eventually provided Defendant Amar with €14,000 from the BEC attack on Victim 9. *Id*.

The co-conspirators then decided to set up a new safe house in Varna, Bulgaria. *Id*. The initial group of conspirators in Bulgaria were Defendant Ciomag. *Id*. at ¶ 29. The co-conspirators were initially unsuccessful in defrauding victim companies in Bulgaria. *Id*. As a result, CC-14 requested that Defendant Amar travel to the Bulgarian safe house to look into why the group was not successful. *Id*.

In or around July 2014, Defendant Amar arrived in Bulgaria and joined the conspirators, which included Defendant Sabina Selimovic, Defendant Ciomag, CC-10, CC-22, and Defendant Flamanzeanu. *Id*. at ¶ 30. Defendant Amar advised the group to use a website for a fake lawyer

to make the transactions appear more legitimate.  *Id*.  Defendant Amar also helped prepare a template for the initial email from the fake chief executive officer of the target company and helped Defendant Flamanzeanu draft emails to company employees.  *Id*.  Defendant Amar also advised the group how to research information regarding target companies, including how to identify key employees.  *Id*.  In addition, Defendant Amar, Defendant Selimovic, Defendant Flamazeanu, and CC-22 made telephone calls to companies the group was targeting.  *Id*.

Following Defendant Amar's introduction to the Bulgarian safe house, the conspirators became more successful in defrauding victim companies.  In or around July 2014, through in or around August 2014, while in the Bulgarian safe house, Defendant Amar, Defendant Ciomag, CC-10, CC-22, Defendant Selimovic, and Defendant Flamanzeanu caused a German company (Victim 6) to wire transfer €539,980 (or $710,073) to a bank account controlled by the conspirators.  *Id*. at ¶ 31.  The conspirators agreed to allow Defendant Amar to keep 5% from this BEC attack.  *Id*.

In addition, on or about August 7, 2014, Defendant Amar and his co-conspirators caused a Finnish company (Victim 10) to attempt a wire transfer of €383,400 (or $512,260) from the company's bank account to a bank account in Hungary controlled by the conspirators.  *Id*. at ¶ 33. Victim 10, however, discovered the fraud and was able to reverse the transaction.  *Id*.

On or about August 26, 2014, Defendants Amar, Selimovic, Ciomag, Flamanzeanu, CC-10, and CC-22, caused a company based in Portugal (Victim 5) to wire transfer approximately €380,000 (or $479,650) to a bank account in Hungary controlled by the conspirators.  *See id*. ¶ 34.[4]  Victim 5 eventually discovered the fraudulent wire transfer, and the Hungarian bank returned

---

[4] The indictment states the BEC attack on Victim 5 occurred between July and September 2014.  The actual date of the wire transfer was August 26, 2014.

the money to Victim 5.   *Id.*

On or around August 26, 2014, Defendant Amar traveled to Budapest, Hungary to receive some of the proceeds from the attack on Victim 6.   *Id.* at ¶ 32.   CC-7's assistant provided Defendant Amar with an airplane ticket from Israel to Hungary.   *Id.*   In Hungary, Defendant Amar met with CC-7's assistant, who provided him with the proceeds.   *Id.*   Defendant Amar gave the proceeds to Defendant Selimovic and her boyfriend.   *Id.*   Defendant Selimovic and her boyfriend then gave Defendant Amar 5% of the proceeds from the attack on Victim 6 (i.e., €26,999 or $35,503).   *Id.*

On or about August 28, 2014, Defendant Amar returned to the Bulgarian safe house.   *See id.* at ¶ 35.   On or about September 4, 2014, Defendant Amar left Bulgaria and returned to Israel. Defendant Amar was then cut out of the BEC scheme being conducted by the other co-conspirators.   *Id.*   In total, while the BEC scheme was being conducted in Turkey and Bulgaria: (a) the attempted loss from the four victim companies was equal to approximately $2,098,283; (b) the actual loss from the four companies was approximately $1,093,557; and (c) Defendant Amar personally received approximately $49,503.   *Id.*

Following Defendant Amar's departure from the scheme, the co-conspirators succeeded in defrauding the following victim companies:

| Victim/Company | Safe House Location | Date of Attack(s) | Loss Amount |
|---|---|---|---|
| Victim 1 | Prague, Czech Rep. | Nov. 10-18, 2014 | €1,995,000 (or $2,482,435.50)<br><br>Attempted Loss: €1,564,080 (or $1,960,417.87)[5] |

---

[5] On or about November 18, 2014, the conspirators defrauded Victim 1 into directing a

| Victim/Company | Safe House Location | Date of Attack(s) | Loss Amount |
|---|---|---|---|
| | | | |
| Victim 4 | Prague, Czech Rep. | Nov. 26 – Dec. 9, 2014 | €5,920,000 (or $7,333,531) |
| Victim 2 | Warsaw, Poland | March 5, 2015 | €570,000 (or $627,342) |
| Victim 3 | Warsaw, Poland | March 10, 2015 | €750,000 (or $803,025) |
| | | | |
| | | **Total Loss Amount:** | **€9,235,000 (or $11,246,333.50)** |

The losses to the victim companies caused by the conspirators after Defendant Amar's departure from the scheme was immense.   Defendant Amar's contributions in the Bulgarian safe house contributed directly to this success.

To understand the cunning nature of the co-conspirators scheme, it is worth viewing some of the actual emails used in their BEC attacks.   In the attack on the Finnish company (Victim 6), which Defendant Amar participated in, the co-conspirators created an email account nearly identical to the email account belonging to Victim 6's president.   In addition, the co-conspirators employed the use of a fake attorney to backstop their story and to make the employee believe they were actually assisting the president in completing a legitimate corporate transaction.

The fraud began by the co-conspirators sending the following email purportedly from Victim 6's president to an employee at Victim 6 (the identities of the of the corporate employees and the company have been redacted for their privacy):

---

wire transfer of €1,564,080 from bank account in Germany to a bank account in Hungary controlled by the conspirators.   Victim 1 discovered the scheme and did not initiate this additional wire transfer.

Lähettäjä:
Lähetetty:                    7. elokuuta 2014 10:20
Vastaanottaja:
Aihe:                         Immediate Attention Required

Hello Mr.

Can you handle for me an important business today if you are in your office?

Best Regards,

This email purportedly from the president appeared legitimate, contained a copy of the company's logo (which we redacted) and originated from a spoofed email address very similar to Victim 6's actual email address.

The employee receiving that email believed he was actually communicating with his company's president and responded accordingly:



Lähettäjä:
Lähetetty:                    7. elokuuta 2014 10:29
Vastaanottaja:
Aihe:                         RE: Immediate Attention Required

Hello

I am in Espoo office so it should be possible

Br

Defendant Amar and his co-conspirators then told the employee that the president needed his assistance regarding a confidential corporate transaction:

| | |
|---|---|
| **Lähettäjä:** | ████████████████████████ |
| **'ähetetty:** | 7. elokuuta 2014 11:00 |
| **Vastaanottaja:** | |
| **Aihe:** | RE: Immediate Attention Required |

I need your full attention concerning a confidential financial matter that I need you to deal with for me. We are in the process of strategically acquiring a company based in Hungary, through a takeover bid and I will need your participation in this priority acquisition.

Let me know if I can count on your support for this operation.

Best regards,

████████████████

The employee, not wanting to upset his boss, expressed his willingness to assist.



| | |
|---|---|
| **Lähettäjä:** | ████████████████████ |
| **Lähetetty:** | 7. elokuuta 2014 11:06 |
| **Vastaanottaja:** | ██████████ |
| **Aihe:** | RE: Immediate Attention Required |

You can count on my support

Br██████

The president then stated that an attorney would contact the employee regarding the transaction.

| | |
|---|---|
| **Lähettäjä:** | ████████████████████████ |
| **Lähetetty:** | 7. elokuuta 2014 11:32 |
| **Vastaanottaja:** | |
| **Aihe:** | RE: Immediate Attention Required |
| **Liitteet:** | NDA_███████████████████A1039_07082014.pdf |

Please find attached the Confidentiality Agreement for the operation I need you to sing and send it urgently by fax to +34 917 91 53 53 Mr. Alberto García the attorney appointed by the European Securities and Markets Authorities (ESMA) for this acquisition. He is taking care of the legal details of the operation. Upon receipt of the fax, he will contact you for further details of the operation management. Please send him also your direct mobile number so we can facilitate the communication. Let me know when you have sent the fax.

Best regards,



Attached to the president's email was a non-disclosure agreement, which the co-conspirators asked

the employee to sign.   Once the employee was bound to this purported confidentiality agreement,

the co-conspirators received some assurance that their scheme would not be uncovered.



Notably, the Non-Disclosure agreement was signed using the president's actual signature.

According to CC-10, Defendant Amar found a website containing actual signatures of the presidents and CEOs that the co-conspirators used to complete their scheme.

The co-conspirators then called the employee and posed as an attorney from the European Securities and Markets Authority (ESMA), an entity that regulates financial transactions in the European Union.   The co-conspirators also followed-up their telephone call with an email from the attorney to the employee.

Lähettäjä:        Alberto García <a.garcia@albertogarcia-esma.com>
Lähetetty:        7. elokuuta 2014 13:04
Vastaanottaja:    ██████████████
Kopio:
Aihe:             Takeover bid

Hello again Mr. ████████

According to our phone conversation I'm writing to reiterate in short the steps to be followed:

- first I will need from you the Identification data of your company in Finland as soon as possible

- second, after we prepare all the required documents for the transaction, Mr. ████████ will send you the invoice containing the banking details;

Should you have any other question, please do not hesitate to write me or to Mr. ████████.

Best regards,


**Alberto García**
Local ESMA Partner
Madrid

T: + 34 911 86 80 19
F: + 34 917 91 53 53

a.garcia@albertogarcia-esma.com
www.albertogarcia-esma.com


esma

Notably, the fraudulent email from the attorney came complete with an ESMA logo at the bottom, again to lend legitimacy to the scheme.   In addition, per Defendant Amar's instructions, the co-conspirators created a website for the fake attorney to lend legitimacy to their fraud (see the URL at the bottom of the email).   The co-conspirators would also oftentimes steal the identity of an actual attorney, in case the employee searched for the attorney's name online.

To further backstop their fraudulent scheme, and as part of their social engineering techniques, the co-conspirators would send an email to the employee from the purported company president assuring the employee that the transaction was proceeding smoothly.   The purpose of this email was to cement the employee's continued confidence and to make the employee energized to see the corporate transaction through to its completion.   The email would also include a form invoice containing the details for where the employee should initiate a wire-transfer of money.



In response to this email, the employee initiated a wire-transfer of €383,400 to the account contained in the attached invoice.



The faux attorney then contacted the employee again to state that he received the wire transfer of

money.



Hello again Mr. ▮▮▮▮▮▮:

I confirm that I have received the transfer confirmation. I will attach it to the takeover file and also confirm it with the Hungarian part. The documentation will be ready and sent by tomorrow.

Best regards,

**Alberto García**
Local ESMA Partner
Madrid

T: + 34 911 86 80 19
F: + 34 917 91 53 53

With the fraud now essentially complete, the co-conspirators continued their social engineering by

sending another email from the purported company president to the duped employee.   In that

email, the purported company president thanked the employee for his swift work in completing

the transaction.   In addition, the purported president asked the employee to continue keeping the

transaction secret for the time being, in an attempt to ensure the company would not discover the

fraud.

> **From:** ████████████████████████████
> **Sent:** 7. elokuuta 2014 15:25
> **To:** ██████████
> **Cc:** a.garcia
> **Subject:** RE: Takeover bid
>
> Thank you for your prompt cooperation. As soon as you receive the rest of documents from Mr. Garcia, please keep them with precaution until the public announcement date of the acquisition – 20 of August.
>
> Best regards,
>
> ████████████████

Defendant Amar and his co-conspirators used this method of social engineering in other BEC attacks they committed, resulting in millions of dollars of losses to the victim companies.

## DEFENDANT AMAR

As noted in the PSR report, Defendant Amar was raised in an intact family and had "a golden youth" and a "happy childhood."  PSR at ¶ 92.  Defendant Amar's parents "provided [him] with all material necessities," and Defendant Amar attended college in Israel.  PSR at ¶¶ 92-93.   Defendant Amar is married and owns a home in Netanya, a city in Northern Israel known for its beaches.   *See* PSR at ¶ 93.

Defendant Amar is also a man of substantial means.   *See* PSR ¶ 113a.   Despite having nearly $1,000,000 in assets (a figure likely much higher in reality) and his own business, he engaged with criminals to assist in perpetrating an international fraud scheme.   Moreover, Defendant Amar's participation in this conspiracy was not his first foray into the world of BEC schemes – in fact, he professed knowledge of other BEC schemes when he first met with CC-10 and Defendant Ciomag in Israel.

Regarding the instant matter, Defendant Amar fought his extradition from Israel to the

United States, having conceded his extradition only after receiving an unfavorable ruling from the Israeli Supreme Court on his extraterritoriality argument.   Moreover, once in the United States, Defendant Amar only admitted his guilt after engaging in a lengthy motions battle regarding his conditions of release.

## ROLE ADJUSTMENT FOR MANAGER OR SUPERVISOR

As part of the plea agreement, the parties agreed to litigate whether the role adjustment under U.S.S.G. § 3B1.1(c) applied to Defendant Amar for being "an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)."   *See* Plea Agreement, ECF No. 57, at 3.   The PSR writer concluded that the role adjustment under U.S.S.G. § 3B1.1(b) applied because "defendant was a manager or supervisor (but not an organizer or leader) …." PSR at ¶¶ 79, 123, pp. 29-30.[6]

The government is asking that a role adjustment under U.S.S.G. ¶ 3B1.1(c) apply because Defendant Amar was a "manager" or "supervisor" in the scheme.   Courts have held that a defendant who served as a *recruiter* or *trainer* of accomplices justifies a role adjustment for being a manager or supervisor under §3B1.1.   *See United States v. Ngatia*, 477 F.3d 496, 501 (7th Cir.

---

[6] The plea agreement stated:

> "The Parties disagree regarding whether the 2-level role adjustment for being an 'organizer, leader, manager, or supervisor,' under U.S.S.G. § 3B1.1(c), applies.   The Government maintains this role adjustment applies, while the defendant maintains it does not.   Under the terms of this plea agreement, the Government may seek this role adjustment at sentencing and the defendant may challenge the applicability of this role at sentencing."

Plea Agreement, ECF No. 57, at p. 3.   We recognize the PSR writer applied the 3-level adjustment under U.S.S.G. § 3B1.1(b).   Consistent with the government's representations in the plea agreement, we will be asking for application of the 2-level role adjustment under U.S.S.G. § 3B1.1(c).

2007) (noting that recruitment and training of accomplices can justify role enhancement); *United States v. Montano*, 250 F.3d 709, 713 (9th Cir. 2001) (affirming role enhancement where defendant told co-conspirators in pharmaceutical smuggling case "when to make a crossing, what pharmaceuticals to purchase, and where to deliver them.").   As noted by the Ninth Circuit in *Montano*, "'[a]n enhancement [under §3B1.1] may be proper where, as here, a defendant organizes others in the commission of the criminal activity even though he does not retain a supervisory role over the other participants'" because "'[t]he enhancement reflects the greater level of culpability of the participant who arranges the transaction."   *Montano*, 250 F.3d at 713 (quoting *United States v. Varela*, 993 F.2d 686, 691-91 (9th Cir. 1993).

In the present case, Defendant Amar served as *both* a recruiter and a trainer of his fellow co-conspirators in the BEC scheme.   Defendant Amar attended the initial kick-off meeting for the co-conspirators in Israel, where he persuaded them to get involved in the BEC scheme by touting his experience in committing similar schemes in the past.   Defendant Amar also agreed to provide his invaluable insights into conducting such schemes, and that he would pass along any new details he learned along the way.   Defendant Amar further agreed to provide all of this advice and wisdom – which ultimately resulted in his co-conspirators engaging in the BEC scheme – in return for receiving 5% of the BEC scheme's profits going forward.

Moreover, Defendant Amar also served as a trainer for the BEC scheme.   As discussed above, when the scheme began to falter in Bulgaria and the co-conspirators stopped successfully attacking companies, CC-14 brought-in Defendant Amar to the Bulgarian safe house to provide his invaluable guidance and expertise to the other conspirators.   That guidance and expertise involved Defendant Amar teaching the co-conspirators how to craft better emails as part of the

scheme, how to make calls to victim companies, and how to research those companies to find better victims to attack. Defendant Amar's tutelage was successful and the group began persuading companies to initiate wire-transfers of substantial sums of money to bank accounts controlled by the conspiracy.

These critical contributions by Defendant Amar to the conspiracy clearly justify the imposition of a role adjustment under § 3B1.1. *See United States v. Greatwood*, 230 F.3d 1368 (9th Cir. 2000) (affirming the imposition of the 4-level enhancement under §3B1.1(a) for leader organizer where the defendant's "role as an instructor" included "recruiting his students and teaching them to file fraudulent tax returns," and where "[h]e helped his students complete and file the fraudulent forms."); *see also United States v. Cooper*, 1996 U.S. App. LEXIS 15638 (9th Cir. June 26, 1996) (affirming imposition of 2-level adjustment where defendant's "actions – including the false representations, and his role in organizing the training class and in recruiting members for the trip – suffice for purposes of the § 3B1.1(c) enhancement"; "While the Appellant was not always the lead person, his presence in the conspiracy was significant enough to merit the two-level increase.").

With a 2-level role adjustment under § 3B1.1(c) applied, Defendant Amar's U.S.S.G. range is 51 to 63 months.[7]  With that in mind, the government believes that a sentence of 63 months is appropriate. That sentence would sufficiently punish Defendant Amar for his criminal conduct in this case and serve as a deterrent to others who may commit such crimes.

---

[7] This differs from the U.S.S.G. range determined by the PSR writer, which was 57 to 71 months because the PSR writer applied the 3-level role adjustment under § 3B1.1(b) because the writer found that more than five participants were involved in the scheme. The government is asking that the 2-level role adjustment under § 3B1.1(c) be applied, consistent with the government's representations in the plea agreement.

A sentence of 63 months would also not be excessive considering sentences given to other defendants involved in BEC schemes involving much lower loss amounts than the instant case. *See* U.S. Dep't of Justice, Press Release, *Nigerian Sent to Prison for BEC Fraud*, April 20, 2018 (noting that the defendant was sentenced to 63 months for conspiracy to commit wire fraud in relation to BEC schemes totaling $823,765 in losses to victims)[8]; U.S. Dep't of Justice, Press Release, *Atlanta Man Sentenced to 5+ Years in Prison for Role in Money Laundering Conspiracy*, May 10, 2018 (noting that defendant was sentenced to 63 months for laundering $646,606.59 in proceeds from BEC schemes)[9]; U.S. Dep't of Justice, Press Release, *Three Sentenced in Cyber Fraud Schemes Involving More than $17 Million*, November 21, 2017 (noting that two defendants were sentenced to 12 years and 10 years, respectively, for their roles in online romance scams and BEC schemes with intended losses of approximately $17 million).[10]

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should sentence Defendant Amar to 63 months imprisonment.

---

[8] *Available at https://www.justice.gov/usao-sdtx/pr/nigerian-sent-prison-bec-fraud* (last checked July 16, 2018).

[9] *Available at https://www.justice.gov/usao-wdpa/pr/atlanta-man-sentenced-5-years-prison-role-money-laundering-conspiracy* (last checked July 16, 2018).

[10] *Available at https://www.justice.gov/usao-wdwi/pr/three-sentenced-cyber-fraud-schemes-involving-more-17-million* (last checked July, 2018)

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845


By: _____/s/_____
      MICHAEL J. MARANDO, N.Y. Bar. No. 4250395
      DAVID B. KENT, D.C. Bar No. 482850
      DIANE G. LUCAS, D.C. Bar. No. 443610
      Assistant United States Attorneys
      555 4th Street, N.W.
      Washington, D.C. 20530
      (202) 252-7068 (Marando)
      (202) 272-7762 (Kent)
      (202) 252-7724 (Lucas)
      Michael.Marando@usdoj.gov
      David.Kent@usdoj.gov
      Diane.Lucas@usdoj.gov