**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| v. |
| HARRY MEIR MIMOUN AMAR, |
| Defendant |

Case No. 16-cr-163-1 (CKK)

**ORDER**
(August 9, 2018)

The parties in this criminal action dispute whether an aggravating role adjustment under Sentencing Guideline 3B1.1(c) should be applied to Defendant Harry Meir Mimoun Amar's sentence. Sentencing Guideline 3B1.1(c) states that the Defendant's offense level shall be increased by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." The Government contends that this enhancement applies to Defendant because he was a "manager" or "supervisor" of the charged criminal conduct. The Court disagrees.

The Government's Memorandum in Aid of Sentencing cites cases from other jurisdictions—*United States v. Ngatia*, 477 F.3d 496 (7th Cir. 2007) and *United States v. Montano*, 250 F.3d 709 (9th Cir. 2001)—for the proposition that "a defendant who served as a recruiter or trainer of accomplices justifies a role adjustment for being a manager or supervisor under § 3B1.1." Gov.'s Mem. in Aid of Sentencing, ECF No. 68, at 17. In the cited cases, the Seventh and Ninth Circuits respectively affirmed district courts' application of 3B1.1 enhancements in cases where the defendants had taught, instructed and/or directed others in carrying out illegal smuggling schemes.

The Court need not look to these out-of-circuit opinions for guidance, however, because opinions from the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") make clear that a 3B1.1 enhancement is not appropriate in this case. The D.C. Circuit has held that "[a]ll persons receiving [a 3B1.1] enhancement must exercise some control over others." *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998). It has also held that "the notion of 'management' or 'supervision,'" as those terms are used under Sentencing Guideline 3B1.1, "connote[s] some sort of hierarchical relationship, in the sense that an employer is hierarchically superior to his employee." *United States v. Quigley*, 373 F.3d 133, 140 (D.C. Cir. 2004); *United States v. Olejiya*, 754 F.3d 986, 991 (D.C. Cir. 2014) (reiterating these principles and noting that there is a "requisite hierarchical relationship" for application of the manager or supervisor enhancement).

The Court has carefully reviewed the Statement of Offense in this case, and finds no evidence that Defendant Amar exercised any control over, or was hierarchically superior to, any of his accomplices. The criminal conduct at issue in this case was a business email compromise ("BEC") scheme, whereby unwitting officials of companies were fraudulently induced to transmit large sums of money to the Defendants. Defendant Amar's participation in the scheme began with his attending a meeting with other co-conspirators to discuss the BEC scheme, during which he acted as a translator. At that meeting, Amar told his co-conspirators that he knew individuals who had conducted a BEC scheme successfully, and also told them to search for a news article on the Internet related to the scheme. Amar was then offered 5% of the proceeds from the BEC scheme if he would agree to attend another meeting about executing the scheme. Amar went to that meeting as well. He told the co-conspirators that he would be willing to introduce

them to certain other individuals who had experience executing the BEC scheme, and also agreed to provide them with any new details he learned about how to conduct the scheme. Amar suggested that they operate the scheme from Israel, but that suggestion was rejected by the other co-conspirators. The co-conspirators traveled to Turkey where, without Amar, they successfully executed the BEC scheme. When, later, the co-conspirators were unsuccessful at executing the scheme in Bulgaria, they requested Amar travel to that country to assist them. Amar did so. In Bulgaria, Amar advised his co-conspirators to use a website for a fake lawyer, helped them prepare a fake e-mail template, advised them on how to research information concerning target companies, and made phone calls to help further the BEC scheme. The scheme was successful in Bulgaria, and the co-conspirators agreed that Amar would be allowed to keep 5% of the proceeds. Amar and the co-conspirators then attempted the BEC scheme on two other companies, but were unsuccessful. Amar was then cut out of the BEC scheme by the other co-conspirators.

Notably absent from these facts is any indication that Defendant managed or supervised any of the co-conspirators. He does not appear to have exercised any control over the other participants in the scheme, nor is there any indication that he was in a hierarchically superior position to any other participant. Instead, it appears that the co-conspirators (in particular Defendants Amar, Daniel Alexandru Ciomag and Cristian Flamanzeanu[1]) each had unique roles furthering the conspiracy and were of roughly

---

[1] The Court has focused its attention on these named Defendants because it has only very limited information about other potential co-conspirators, who were either not indicted or were indicted but have not been brought before this Court.

equal stature within the conspiracy.  As discussed above, Amar acted as a translator at an initial meeting where the co-conspirators discussed how to conduct the BEC scheme, gave advice on how BEC schemes worked generally, suggested locations for the scheme to be implemented, and offered to connect the conspirators with others who had implemented the scheme.  When called to Bulgaria, Amar gave the co-conspirators advice on how the scheme could be executed more effectively, helped prepare documents for the scheme, and also made phone calls to further the scheme.  Ciomag was also at the initial meeting with Amar, and appears to have been in charge of the technical aspects of the scheme (setting up a server, installing software and encryption programs, and obtaining domain names).  The Court understands Flamanzeanu to have been in charge of the graphic design elements of the scheme (copying the signatures of high ranking officials at target companies and creating "spoofed" e-mails).  The Government has not offered, and the Court cannot identify, any evidence that any of these individuals managed, supervised, controlled, or were hierarchically superior to, any of the others.

Accordingly, the Court disagrees with the Government that Defendant Amar was a manager or supervisor.  It will not apply the role adjustment under Sentencing Guidelines 3B1.1(c) when calculating Defendant's sentence.

**SO ORDERED.**

        /s/
COLLEEN KOLLAR-KOTELLY
United States District Judge